# 14-1259(L), 14-1557(CON)

# United States Court of Appeals

*for the*

# Second Circuit

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

– v. –

STRATOCOMM CORPORATION, ROGER D. SHEARER,

*Defendants-Appellants,*

CRAIG DANZIG,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT
## ROGER D. SHEARER

JAMES KNOX
E. STEWART JONES, PLLC
*Attorneys for Defendant-Appellant
Roger D. Shearer*
The Jones Building
28 Second Street
Troy, New York 12180
(518) 274-5820

# **TABLE OF CONTENTS**

Table of Authorities ...........................................................................3

Jurisdictional Statement ....................................................................5

Question Presented............................................................................5

Preliminary Statement.......................................................................6

Statement of Facts...........................................................................12

Discussion ......................................................................................20

   I.     DISTRICT COURT ERRED IN DETERMINING THAT THERE
        WAS AN ABSENCE OF ANY TRIABLE ISSUE OF MATERIAL
        FACT AS TO WHETHER DEFENDANTS VIOLATED SECTION
        17(a)(1) OF THE SECURITIES ACT OR SECTION 10(b) OF THE
        EXCHANGE ACT, AND THEREFORE PARTIAL SUMMARY
        JUDGMENT SHOULD NOT HAVE BEEN GRANTED .....................20

      1.   *StratoComm's Press Releases and Executive Overview Were Not*
          *False or Misleading.*..........................................................24

          a.  The November 2007 and January 2008 Press Releases
              Were Not False or Misleading. ...................................24

          b.  The 2008 Executive Informational Overview Was
              Not False or Misleading..........................................27

          c.  The May 5, 2009 Press Release Was Not False
              or Misleading ........................................................30

      2.   *District Court Erred in Determining That Defendants Made*
          *Materially Misleading or False Statements* .........................31

3.  *District Court Erred in Determining that StratoComm and*
    *Shearer Made False and Misleading Statements with Scienter*..........33

II.   DISTRICT COURT ERRED IN CONCLUDING THAT NO
      TRIABLE ISSUES OF FACT EXISTED AS TO WHETHER
      DEFENDANTS IMPROPERLY ENGAGED IN THE OFFERING
      AND SALE OF UNREGISTERED SECURITIES
      SHOULD NOT HAVE BEEN GRANTED.............................................38

Conclusion ...........................................................................................40

# TABLE OF AUTHORITIES

## *Statutes, Regulations and Rules*

15 U.S.C. § 77q(a) ................................................................21

15 U.S.C. § 77v(a) ..................................................................5

15 U.S.C. § 78u ......................................................................5

15 U.S.C. § 78aa ....................................................................5

15 U.S.C. § 78j(b) ................................................................21

17 C.F.R. § 240.10b-5......................................................*passim*

28 U.S.C. § 1291 ....................................................................5

Fed. R. Civ. P. 56 ............................................................20, 23

## *Cases*

*Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505 (1986)..........................20

*Azalea Meats v. Muscat*, 386 F.2d 5 (5th Cir. 1967) ..............................................  23

*Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978 (1998) ..................................32

*Colby v. Klune*, 178 F2d 872 (2d Cir. 1949)............................................................20

*ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
      553 F.3d 187 (2d Cir. 2009) ........................................................................32

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375 (1976) .........................33

*Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545 (1999) .......................................20

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir. 1978) ..........................34

*Schmidt v. McKay*, 555 F.2d 30 (2d Cir. 1977) ......................................................23

*S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)........................21, 33

*S.E.C. v. McNulty*, 137 F.3d 732 (2d Cir. 1998)................................................33, 34

*S.E.C. v. Murphy*, 626 F.2d 633 (9th Cir. 1980)......................................................39

*S.E.C. v. Obus*, 693 F.3d 276 (2d Cir. 2012) .........................................................35

*S.E.C. v. Sunbeam Gold Mines Co.*, 95 F.2d 699 (9th Cir. 1938) ...........................38

*S.E.C. v. StratoComm Corp.*, ___ F. Supp.2d ___, Fed. Sec. L. Rep. P 97,
     825, 2014 WL 689116 (February 19, 2014) ........................................*passim*

*Wellman v. Dickson*, 475 F. Supp. 783 (S.D. N.Y. 1979) ........................................39

## JURISDICTIONAL STATEMENT

The jurisdiction of the District Court was invoked pursuant to Section 22(a) of the Securities Act of 1933 (15 U.S.C. § 77v[a]) (the "Securities Act") and Sections 21 and 27 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78u and 78aa) (the "Exchange Act") based upon the fact that this is a case involving alleged violations of the federal securities laws including Sections 5 and 17(a) of the Securities Act and Section 10b and Rule 10b-5 promulgated thereunder of the Exchange Act.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1291 based upon the fact that this is an appeal from a final order of the United States District Court for the Northern District of New York granting summary judgment on the issue of liability.

Defendant-Appellant Roger Shearer filed his notice of appeal on April 18, 2014, within thirty (30) days of the Decision and Order of the District Court for the Northern District of New York entered February 19, 2014.

## QUESTION PRESENTED

Whether District Court erred in determining no triable issues of fact existed, thereby justifying granting partial summary judgment in favor of the Securities and Exchange Commission?

5

It is respectfully submitted that the District Court erred in granting partial summary judgment in favor of plaintiff Securities and Exchange Commission on the issue of liability, as triable issues of fact existed as to each and every cause of action against defendant Roger Shearer determined by District Court, making the grant of summary judgment erroneous.

## PRELIMINARY STATEMENT

This is an appeal from a decision and order of the Northern District Court of New York (Hon. Thomas J. McAvoy), which granted a motion for partial summary judgment by plaintiff Securities and Exchange Commission (SEC), against defendants StratoComm Corporation, Roger D. Shearer, and Craig Danzig, finding defendants liable under various causes of action brought in a civil enforcement action commenced by the SEC on October 4, 2011 (S.E.C. v. StratoComm Corp., ___ F. Supp.2d ___, Fed. Sec. L. Rep. P 97, 825, 2014 WL 689116 [February 19, 2014]) [SPA: 1-37].[1]

District Court erred in granting partial summary judgment in favor of the Securities and Exchange Commission (SEC).  In unequivocally adopting every assertion made by the SEC, while contumaciously and simultaneously ignoring every counterpoint of fact asserted by defendant Roger Shearer, District Court committed the quintessential errors a court can make in deciding a summary

---

[1] References to "SPA" are to the Special Appendix submitted herewith and comprised solely of the District Court's decision granting partial summary judgment on the issue of liability.

judgment motion: failing to assume the veracity of the factual assertions of the nonmovant, failing to draw all reasonable inferences in favor of the nonmovant, and crediting wholesale the factual assertions of the movant.

StratoComm is a corporation that was started to develop, to market and to provide telecommunications systems deployed by aerostat to customers around the world. Roger D. Shearer is the founder, CEO and prime mover of StratoComm. During 2007 and 2008, StratoComm issued press releases noting that it had entered into two sales agreements, one in Cameroon and one in Madagascar, for sakes of its telecommunications systems, at a sales price totaling $60 million.

Defendant Shearer has conceded that his company has yet to ultimately consummate these or any sale of the telecommunications systems it has designed, developed and marketed. However, Mr. Shearer has always maintained, and continues to maintain to this day, that the company he founded—defendant StratoComm—has developed a communications system that has the potential to transform the delivery of telecommunications systems in the developing world and the third world, thereby giving those technologically undeveloped countries access to the modern tools of commerce, communication and technology that are critical in today's global economy.

Shearer and StratoComm have spent years developing two different telecommunications systems; each is deployed by means of an aerostat.

Suspended from the aerostat, a proprietary telecommunications payload broadcasts communications on any desired frequency or bandwidth, or combination of same, chosen by the end-line consumer. The company's vision has always been to target the developing world, where traditional infrastructure is lacking, because setup and deployment of StratoComm's systems is rapid and inexpensive compared to construction of traditional telecommunications infrastructures. Most importantly, StratoComm's technology is customized to meet the specific requirements of any purchaser, and thus whether a purchaser seeks to provide a cellular telephone network, a Wi-Fi network, a Wi-MAX network, a radio network—or any combination of such networks—the StratoComm proprietary payload that provides these telecommunication services is built to the specifications of the ordering party. Of course, the dimensions and other specifications, including the helium-replenishment capabilities of the deploying aerostat, must likewise be custom-designed to adequately and safely deploy each individual, custom-built payload.

Part and parcel to designing and developing these systems, StratoComm has acquired significant intellectual property, including patents, pertaining to the relevant technology. Although the telecommunications payload is the only truly exclusively StratoComm-built part of each system, as the supporting aerostats have always been intended to be purchased as needed from aerostat manufacturers, StratoComm has designed, developed and acquired significant intellectual property

related not only to the proprietary telecommunications payloads it markets, but also to the aerostats themselves, including patents related to the helium-replacement systems, essential to keeping aerostats aloft for an extended period of time.

All of this is to say that while StratoComm has yet to consummate a sale—though as will be shown below it has entered into several sales agreements in the best of faith—StratoComm has not been idle during its existence as a company. It has actively developed and marketed a complex, thoroughly modern and thoroughly innovative system of telecommunications technology. In doing this, it has raised money from friends, colleagues, family other associates. But in raising those monies the intention of Roger Shearer and StratoComm has been simply the success of StratoComm as a telecommunications company. Every dollar raised has gone back into the company, to purchase supplies, equipment or technology, or to pay employees. Unlike cases of actual fraud, where companies and their principals have intended to deceive investors, StratoComm and Roger Shearer have endeavored to accurately and regularly communicate with investors about the risks of investment as well as the status of the company. More importantly, Shearer and StratoComm have always sought to careful husband the resources provided by investors because Roger D. Shearer has always believed, and continues to believe,

that StratoComm will ultimately be a commercial success, and he has never stopped working toward that goal.

StratoComm also arranged for the production of an Executive Informational Overview, which was a 50-page publication about the company, its technology and its aspirations. Within that document is cautionary language warning any reader that StratoComm is a corporation without assets or income, whose success is entirely potential success, the realization of which depends upon many uncontrollable factors. Rather than an encouragement to invest, the Overview represents a caution against investment in StratoComm for the Overview's readers.

Later, in 2009, StratoComm, through Shearer, issued a third press release indicating that the company was going to turn on its first system, which was a test of its telecommunications unit—the company's proprietary telecommunications payload—performed in 2009 in Cameroon. The telecommunications broadcast unit was deployed on a tower rather than by means of an aerostat, yet it represented an important milestone in the company's progress and established that StratoComm's telecommunications technology worked as designed.

Although Mr. Shearer has continued to assert his devotion to StratoComm, to the vision of its ultimate success and to StratoComm's investors, the ultimate undeserved condemnation has been delivered in the form of the District Court's determination to ignore his declaration—honestly and earnestly made—as to his

motives, intentions and perspective, and to adopt without reservation the aspersions cast upon Mr. Shearer's intentions and motivations by the SEC.  The District Court ignored the declarations of the many investors who swore that they were made well aware by Mr. Shearer of the risks of investment in StratoComm, the true status of the company and the probabilities of future success.  The District Court ignored the utter absence of a profit motive or any evidence of plundering of corporate assets on the part of Mr. Shearer, and the District Court ignored the very real existence of the proprietary payload and the viable aerostat technology which, as a package, Mr. Shearer and StratoComm have been marketing for many years. It is respectfully submitted that none of these things should have been ignored, but should have been considered in rebuttal to the government's assertions of scienter and, more largely, fraud on the part of StratoComm and Roger Shearer.  It is further submitted that Mr. Shearer has raised more than de minimis issues of fact that deserve to be settled at trial.  He has raised real issues of fact that go directly to the heart of the most central issue of this case: his intentions, and they have been honorable from the start.

## STATEMENT OF FACTS

StratoComm was incorporated in Delaware in 1997, and Roger Shearer is its founder, majority shareholder and CEO [A: 38-39, 149-151].[2]  StratoComm has designed and manufactured a proprietary, telecommunications payload, which it has designed as a part of a telecommunications infrastructure system to be deployed by the use of lighter-than-air, unmanned vehicles known as aerostats [A: 58, 63, 228-229, 233].  StratoComm has sought from its inception to market these systems worldwide, consisting of three components: the users segment, the flight segment and the ground segment, each of which are themselves comprised of separate and distinct components [A; 152].  The flight segment consists of the aerostat, a tether, and the mooring system, each of which incorporates StratoComm's proprietary technology [A: 152].  The proprietary payload carried by the aerostat is a WiMAX-based, fixed wireless communication system which allows for configuration of other transmission technologies [A: 152].

StratoComm has developed two of these airborne telecommunications systems, a Transitional Telecommunications System (TTS) and a Stratospheric Telecommunications System (STS) [A: 62, 229].  While the former is intended to be the technology of today, which StratoComm is presently able to deliver to any purchaser able to secure the necessary funding, the STS is aspirational technology,

---

[2] References denoted "A:" are to the joint appendix on appeal filed with consolidated appeal No. 14-1557 by Appellant StratoComm Corporation.

differing essentially in the fact that the STS is intended to be deployed at a significantly higher altitude than the TTS and would remain aloft for significantly longer periods of time, thereby supplying telecommunications services to a broader geographical area for a longer period of uninterrupted time [A: 62, 229]. Of course, the technological hurdles to achieving the success of the STS are far more substantial than those hurdles – long since overcome – that thwarted the deployment of a TTS. Thus, while the TTS represents what can be done now, the STS is truly a vision of the future [A: 82-89, 229].

From late 2007 until April 2010, StratoComm raised approximately $4 million from approximately 100 investors [A: 39, 150]. StratoComm and Shearer have established that, contrary to the assertions of the SEC and the findings of the District Court, these were essentially all accredited investors, both economically sophisticated and well-aware of the present status and probable future of StratoComm [A: 231-233].

Through a variety of means, StratoComm relayed to investors that the TTS would be able to provide up to 500,000 subscribers with telecommunications services [62, 239]. The STS, which was to be deployed in the stratosphere at 65,000 feet elevation, would be able to provide these services to three million consumers in a 1,000-kilometer radius [A: 60, 239]. By marketing and selling the

TTS, StratoComm intends to fund the development, marketing and sale of the STS [A: 58, 239].

StratoComm's marketing efforts have always envisioned that once a sale ultimately occurs, the system sold will be unique and will necessarily be custom-manufactured for the particular purchaser.  In short, every system is ultimately "made to order."  As such, it is economically impractical and simply poor business practice to keep units "on the shelf," akin to asking a bespoke tailor to keep on hand pre-made suits [A: 44, 77, 154, 157, 228-229].  What StratoComm had beginning in 2007 was a prototype of its telecommunications payload, and this existed at its Eatontown, New Jersey facility, just as the above-mentioned tailor might have an especially well-made sample jacket on hand for demonstration purposes [A: 228-229].  StratoComm always envisioned compiling the required components of any ordered system once a purchaser had entered a contract and delivered initial purchase money to StratoComm [A: 229].

In November, 2007, StratoComm, through Shearer, issued a press release announcing one of its early successes: it had negotiated a $45 million system sale. StratoComm, at the time the release was issued, had just entered into a contract to provide three of the TTS systems to a joint-venture purchaser in Cameroon and, at the time, StratoComm looked forward to delivering reliable telecommunications services to those customers [A: 129-131, 229].  Unfortunately, the purchaser,

14

Evergreen ISP Platform, PLC, although a contracting party, never succeeded in delivering the initial funding necessary to trigger production and consequent delivery of the systems purchased [A: 157].

Meanwhile, on January 29, 2008, StratoComm, again through Shearer, issued a second press release announcing a $15 million sale of a TTS to a joint venture partner in Madagascar [A: 132-134]. Unfortunately, the sale has ultimately never been consummated, but it is not the lack of consummation that formed the basis of the SEC's complaint and motion for summary judgment [A: 157]. Nor does the SEC allege that the sales agreements never existed or were not entered into in good faith.

Instead, as to both press releases, the SEC alleged that the misrepresentation made by StratoComm was in its description of itself as a "provider" of telecommunications infrastructure technology [A: 19-21]. The SEC has never disputed that StratoComm's TTS is a telecommunications infrastructure technology, but because StratoComm has yet to find success in its sales efforts, the SEC asserts that it cannot be a "provider" of the technology it has been seeking to provide [A: 19-21]. The question appears to be hopelessly semantic: does one become a provider only after he has provided something, as he provides it, just before he provides it, or as soon as he is able and seeks to provide it? It is respectfully submitted that under all of the above circumstance a business would

15

properly be considered a "provider," whose status differs only in temporality, and although this appears to be a pointless descent into a semantic morass of denotations and connotations, in attempting to understand whether one of these "providers" is appropriately so called, determinations about the intentions of StratoComm and Mr. Shearer have been made, and wrongly made, by District Court.

Roger Shearer has been a provider of telecommunications infrastructure technology for many years and certainly before any of the press releases were issued describing StratoComm as such a provider. It has only been the vagaries of fortune and the efforts of those actively working against the success of StratoComm that have thus far thwarted StratoComm from fulfilling every possible definition of "provider" of telecommunications infrastructure technologies listed above.

In early September 2008, StratoComm published an Executive Informational Overview, which was a report about the company prepared by Crystal Research Associates at the behest of StratoComm [A: 58-109]. The Executive Informational Overview referred to "StratoComm's aerostat" and described it and the TTS of which it was a part in the present tense. However, the Overview also made it very clear that StratoComm did not itself possess or manufacture aerostats, but was "depend on a limited number of qualified manufacturers for the aerostat

component of its Transitional System," and intended to rely upon a "preferred supplier" [A: 100].

The Overview depicted the aerostats as they would be deployed, and although the SEC has contended that these renderings gave the misleading impression that they represented existing StratoComm products, each portrayal was clearly labeled a "rendering" or a "depiction" [A: 22, 61, 72, 83]. In any event, as contended above and below, the depictions did depict actual StratoComm products, though none had yet been sold.

The Overview discussed the sales previously publicized by the press releases noted above, and specifically stated that joint-venture contracts in Madagascar and Cameroon had "produced initial sales contract for TTS units valued at $60 million"—specifically thereby stating that the contracts were valued at $60 million but that $60 million had yet to change hands, as the Overview further noted that the contracts were "expected to result in TTS sales of $60 million" and the first revenues from said contracts were not expected to be received until some point in the future [A: 64, 70]. Of course, the Overview also discussed at length the risks the company and its investors faced, including that there was no assurance that the company would generate significant revenues or be able to generate sufficient cash flow to meet expenses or achieve profitability [A: 98-105]. The Overview also

baldly stated that, as of its publication, the company had "no revenues[,] limited assets and ha[d] experienced operating losses since inception" [A: 98].

Finally, in May 2009, StratoComm issued a press release stating that the company was making preparations to send a team of engineers to Douala, Cameroon [A: 146-147].   The release stated that the purpose of the visit was for a first system turn on.  Indeed, StratoComm engineers traveled to Cameroon with the company's proprietary payload and deployed the payload on a tower to demonstrate the capabilities of the payload to provide telecommunications services [A: 230].  It is undisputed that the visit did occur and that the system functioned as Mr. Shearer has stated it would.

The SEC commenced this civil enforcement action in 2011 against StratoComm, Shearer, and Craig Danzig, who was a StratoComm employee accused of acting as an unregistered broker of securities [A: 15-30].  Defendants StratoComm and Shearer answered, but defendant Danzig, pro se, has never appeared in the case [A: 31-37].  At the close of discovery, the SEC moved for partial summary judgment, contending, as relevant to defendant Shearer, that the above-referenced statements were materially false and misleading, and made with the intent to defraud investors who were consequently induced to invest in StratoComm [A: 43-52].  Additionally, the SEC contended that StratoComm, by

18

and through Shearer, issued and sold securities in an unregistered transaction that was not exempt from the registration requirement [A: 17-18].

District Court found that "[a] reasonable fact finder could only conclude that in preparing and disseminating the press releases and Executive Overview . . . [,] Shearer engaged in knowing misconduct" [SPA: 26-27].  Specifically, the District Court concluded that Shearer—and by extension StratoComm—had issued false and misleading statements that the TTS existed, and that StratoComm was a "provider" of telecommunications infrastructure technologies [SPA: 25].  District Court also determined that defendants engaged in sales of unregistered securities and that defendants had failed to establish the applicability of any potential exemption to the registration requirement [SPA: 33-37].

The District Court has bifurcated the merits portion of the summary judgment motion and the relief portion, and as of this writing the SEC has made a motion for relief, opposed by Shearer and StratoComm, which has yet to be decided [SPA: 37; A: 12].  This appeal follows the decision and order of the District Court to grant partial summary judgment to plaintiff SEC [A: 312-315]. StratoComm separately appeals from the decision and order of the District Court, in consolidated appeal No. 14-1557 [A: 316-317].

**DISCUSSION**

II.    DISTRICT COURT ERRED IN DETERMINING THAT THERE WAS
AN ABSENCE OF ANY TRIABLE ISSUE OF MATERIAL FACT AS
TO WHETHER DEFENDANTS VIOLATED SECTION 17(a)(1) OF
THE SECURITIES ACT OR SECTION 10(b) OF THE EXCHANGE
ACT, AND THEREFORE PARTIAL SUMMARY JUDGMENT
SHOULD NOT HAVE BEEN GRANTED.

It is axiomatic that, "in ruling on a motion for summary judgment, the
nonmoving party's evidence is to be believed, and all justifiable inferences are to
be drawn in [that party's] favor" (Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct.
1545, 1551-1552 [1999] [citations and internal quotations omitted]).  Most
importantly, when credibility is an issue, "absent an unequivocal waiver of a trial
on oral testimony—credibility ought not, when witnesses are available, be
determined by mere paper affirmations or denials that inherently lack the important
elements of witness' demeanor" (Colby v. Klune, 178 F2d 872, 873-874 [2d Cir.
1949]).  Summary judgment should only be granted when "the movant shows that
there is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law " (Fed. R. Civ. P. 56 [a]).  If , after according the
nonmovant all possible inferences,  "the evidence is such that a reasonable jury
could return a verdict for the nonmoving party," summary judgment is
inappropriate.  (Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505
[1986]).

To prevail in its motion for summary judgment herein, the SEC was required to demonstrate the absence of any triable issue of fact as to alleged violations of Section 17(a)(1) of the Securities Act or Section 10(b) of the Exchange Act and Rule 10b-5 (see 15 U.S.C. § 78j[b]; 17 C.F.R. § 240.10b-5 and 15 U.S.C. 77q[a]). To do so, it was incumbent upon the SEC to demonstrate that, in connection with an offer or sale of a security (under § 17[a][1]), or in connection with the purchase or sale of a security (under 10[b] and Rule 10b-5), "the defendant[s], acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device" (S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 [2d Cir. 1996]); and, further, that there exists no triable issue of fact as to any one of those elements.  In this case, the SEC failed to show—and District Court erred in concluding—that there was no triable issue of fact as to whether the statements made by defendants were false or misleading, whether those statements were material, and whether the defendants made false or misleading statements with scienter.

Here, the statements made by Shearer and StratoComm were completely true in the facts they related.  They were provided to inform present investors of developments of the company, and were not provided to induce future investment. The purpose was one of communication of information to existing shareholders. When read as a whole, in order and in light of the other statements previously

21

made, the press releases and Executive Informational Overview paint a picture that shows a company that, while hopeful for future success, was clearly hampered by lack of revenue, lack of a guaranteed future stream of revenue, and dependent upon uncertain market conditions.  In reaching its decision that defendants' statements were false or misleading, District Court choose to focus on a few choice words and phrases lifted out of context and analyzed in isolation, in clear derogation of the applicable, well-established law that requires a factfinder to evaluate such statements in the complete context in which they are made and exist (see 17 C.F.R. § 240.10b-5[b]).

Although neither false nor misleading, the statements made—to the extent they might be viewed as misleading, were not material.  As noted above the statements which the SEC has attempted to prove actionable as fraudulent must be viewed in light of all of the information that was made available to investors.  Extracted from that context and viewed in isolation, whether a statement appears to be material or not is irrelevant.  As discussed below, viewed in the original context, the statements highlighted by the SEC in its motion, and by District Court in its decision, are neither misleading nor materially alter the total milieu of accurate information provided to and available to StratoComm investors.

Scienter—knowledge or consciousness of fraud—in an individual presents a classical question of fact as to which summary judgment is generally inappropriate

22

(see Schmidt v. McKay, 555 F.2d 30, 37 [2d Cir. 1977]).  It is respectfully

submitted that in this case the District Court succumbed to the classic temptation to

apply a superficial, simplified analysis to the complexities of the technology and

business model at issue, thereby ignoring the "legion" of cases which "warn

against the use of the summary judgment procedure provided by Rule 56 of the

Federal Rules of Civil Procedure to unravel a tangled skein of facts" (Azalea Meats

v. Muscat, 386 F.2d 5, 9 [5th Cir. 1967]).

Mr. Shearer is not some wanton profiteer attempting to get rich off duped

investors.  He is a man with a vision who has invested decades of his life, all of his

monies and all of his energies into making StratoComm a success.  He has made

this clear in his depositions, his personal rebuttal to the SEC complaint ("The Truth

Should Matter" [A: 135-145]), and his affidavit, to which were appended

numerous declarations of shareholders who support StratoComm and Mr. Shearer

[A; 227-293]).  Here, District Court presumed that scienter existed based upon its

conclusion that the statements were misleading, utterly ignoring the rebuttal proof

provided by Mr. Shearer and submitted on his behalf [SPA: 24-27].  Whether Mr.

Shearer possessed the requisite degree of scienter justifying a grant of summary

judgment in this case as to the securities fraud causes of action is not a simple

question, and to answer it through simplification of the record facts, District Court

necessarily ignored a number of triable issues of fact that should have been left to a

factfinder who could hear testimony and judge the demeanor of the testifying

witnesses.

1. ***StratoComm's Press Releases and Executive Overview Were Not False or Misleading***

a. *The November 2007 and January 2008 Press Releases Were Not False or Misleading.*

First, the November 20, 2007 press release was not false or misleading.

That press release announced a $45 million contract for the sale of three TTS

units, and there is no dispute in the record that the referenced contract existed and

was entered into in good faith by StratoComm.   District Court determined that

these press releases were misleading because they supposedly gave the false

impression that the TTS existed when it did not.  However, Shearer's declaration,

as well as his deposition testimony and other statements made within the context

of this litigation, make clear that whether the TTS "existed" is a question of

semantics and business practicality rather than one of fraud.

As stated above, the systems that StratoComm offers for sale are complex,

custom-designed systems that cost millions of dollars.  One does not simply keep

a few on the shelf in a storeroom in the hopes that a buyer will need the one that

has been manufactured and shelved, and in the simultaneous hope that a multi-

million dollar mistake has not been made by building something unique that no

one might want.  Thus, as stated ad nauseum by Mr. Shearer, the TTS "existed" at

all times in the sense that StratoComm was ready and able to build and deliver one upon securing funding from a purchaser, and this fact was independently confirmed  [A: 208].

District Court focuses on a single sentence from a deposition Shearer gave in 2008 to justify—wrongly—the total invalidation of his affidavit submitted in opposition to the contentions of the SEC that the TTS never "existed" [SPA: 16; A: 310-311].  However, that out-of-context statement is not contradicted by Shearer's present assertions that StratoComm "at all times possessed its proprietary telecommunications payload" and "it manufactured the proprietary telecommunications payload."

The present assertion is easily harmonized with the prior deposition testimony.  In 2008, Shearer was being asked about what was meant in a mission statement that had been issued before the deposition.  Shearer was asked to respond to the present-tense sentence of "StratoComm is a developer and provider of telecommunications infrastructure," and his response that StratoComm had yet to manufacture a payload was in terms of what was true as of the date the mission statement was written [A: 311], and referred not to the proprietary payload present at the Eatontown, New Jersey facility, but to the payloads that would be manufactured and supplied to a paying purchaser.  The payloads referred to by Mr. Shearer in the 2008 deposition were different from the telecommunications

25

payload that has, since well before 2008, existed in the Eatontown, New Jersey, StratoComm facility, and which was deployed in Cameroon for a time as part of TTS beta testing in 2008.

If the SEC sought to show that Shearer was attempting to contradict his prior testimony by affidavit, it was incumbent upon them to show the contradiction beyond any other probable inference. Simply pulling out one page of a deposition, bereft of its original context, with no indicia of the subject of the testimony, the question asked, or any other reference to the context, and declaring that said statement contradicts the present affidavit of a defendant, simply cannot be sufficient proof to meet the movant's burden to establish the absence of a triable issue of fact. Instead, it seems to be deliberate obfuscation. The District Court readily accepted the invitation to indulge in this blatant contextomy, blindly accepting that the quoted fragment—supplied by the SEC in reply to defendant Shearer's papers opposing summary judgment—had to do with the matters referred to in Shearer's declaration. This blatant quote mining cannot be sufficient to invalidate an otherwise credible affidavit of a defendant whose credibility is central to the issue of scienter, to this case and to this motion for summary judgment.

District Court also took umbrage with StratoComm's characterization of itself in the press releases as a "provider" of telecommunications infrastructure

26

technologies.  However, it is again respectfully submitted that, in reaching its

determination that this characterization was misleading, District Court lost itself in

a semantic conundrum, confounding the classical formulation of *cogito ergo sum*.

Simply put, when StratoComm marketed the TTS it had designed, it was by

definition a provider of telecommunications infrastructure technologies.   It did

not have to have first provided those technologies to a buyer in order to become a

provider.  The act of consummating a sale would not magically transform

StratoComm from a state of nonbeing into one of a "provider."

Moreover, its press releases did not lay claim to some vast prior provisions

of telecommunications infrastructure technologies; the press releases simply

sought to convey events that were transpiring within the company.  It is

undisputed that in November 2007 StratoComm entered into a contract for sale of

three TTS units for $45 million, and that in January 2008 it entered into an

additional sales contract for a single TTS unit for $15 million.  That the

purchasers were never able to ultimately meet their contractual obligations did not

obviate the fact that the contracts existed and were entered into in good faith by

StratoComm, as the company related through its press releases.

        b. <u>*The 2008 Executive Informational Overview Was not False or*</u>
           <u>*Misleading.*</u>

When read as a whole, the Executive Informational Overview did not

contain false or misleading statements.  In the main, District Court improperly

found that the Overview was misleading because it used "present-tense statements" to describe the characteristics of the TTS.  The tense used, it is submitted, did not make the Overview misleading.  As stated in defendants' opposition to plaintiff's motion in District Court, the Overview made clear that StratoComm did not possess or manufacture the aerostat, but was instead "dependent on a limited number of qualified manufacturers for the aerostat component of its [TTS]," and possessed on hand only the proprietary payload, which actually was a prototype, and that systems sold would be built to the specifications of prospective purchasers.

Although the Overview referred to the sales announced in the two press releases discussed above, the Overview specifically stated that StratoComm had "joint venture agreements with entities in Cameroon and Madagascar that have produced initial sales contracts for TTS units valued at $60 million," under which the company expected "to begin receiving funds" in late 2008, implying that it had an expectation in receiving the funds, but had not yet begun to receive any as of the publication of the Overview [A: 64].

The Overview also specifically stated that the company had no revenue, limited assets, and had experienced significant losses, and stated that there was no assurance that its expectations of future revenue would ever be realized [A: 98-103].  District Court, implausibly, completely ignored theses specific caveats and

qualifiers in reaching its decision, and again read out a few choice phrases from the

whole of the Overview that, when presented in isolation, only seem to indicate that

the Overview was misleading.  But what is lost in the District Court's decision is

the fact that the Overview is approximately 50 pages in length and, as noted above,

contains substantial cautionary and qualifying information and language, as well as

a complex description of StratoComm's technology and business model, as to

which no reader could be left with any conception other than that StratoComm was

a speculative venture—possessed of a brilliant idea and technology with great

potential—but a potential that was as yet unrealized in terms of sales revenue.

Lastly, District Court clung to the phrase "installed TTSs," which appeared

in the 50-page Overview in but a single location, wherein the Overview stated that

"StratoComm allocates the majority of its financial and personnel resources to

technical support of installed TTSs and its stratospheric [Lighter Than Air Vehicle]

development program"—a statement that was actually true [A: 63].  The phrase

was part aspirational and part descriptive.  The intent of the statement was to

convey that manufacturing was not the focus of the company's endeavors, but that

development of new technology, including the forward looking STS program, and

the maintenance of the TTS units it hoped to begin selling, would be the focus of

the company's endeavors and revenue.

District Court drew from this single sentence an implication that StratoComm had sold multiple TTS, but if such sales had occurred, they certainly would never have been mentioned only in this oblique and opaque fashion in all of the 50 pages of the Overview, but would have been discussed at length and highlighted.  District Court erroneously interprets poor phraseology as inescapably an attempt to delude, ignoring the more obvious implications and inferences that would likely be drawn from the same writing by an average reader.  Conceivably, one might accept District Court's interpretation if the reference had been oft repeated, but it is a phrase that occurs but once in a very large document, and to treat it devoid of that larger context ignores the reality within which the statement was made.

        c.  *The May 5, 2009 Press Release Was Not False or Misleading.*

District Court found that the May 5, 2009 press release was misleading because, as it announced a turn on of an "initial system," it implied that StratoComm was installing a TTS in Cameroon—although "TTS" was never mentioned or referred to in the press release whatsoever [SPA: 20-21; A: 146-148]. District Court went on to declare that, instead, StratoComm was installing "a much more rudimentary system involving the placement of an antenna on a radio tower," which is actually an unfortunate parroting of the derogatory description of the

Cameroon system turn-on proffered by the SEC in this case [compare SPA: 21 with A: 23].

In reality, the press release accurately described what was going to occur: StratoComm engineers and technicians traveled to Cameroon to deploy the company's proprietary telecommunications payload, which was admittedly affixed to a tower, for testing and demonstration purposes.  The substantial benefit to the company was to establish the functionality and reliability of the proprietary telecommunications payload technology to the joint venture partner in Cameroon with whom StratoComm had contracted for the sale of three TTS.  The characterization that the deployment was "much more rudimentary" is inaccurate.  Again, District Court used blithe language to reduce to absurdity what was in reality a complex technological exercise and demonstration of viable, cutting-edge technology.   The abject rejection of defendants' version of events, in favor of the version offered by the SEC, represents a rejection of the classical summary judgment standard and serves to deprive defendants of their day in court, where an unbiased trier of fact may weigh these competing versions and decide independently where the truth lies.

## 2. *District Court Erred in Determining That Defendants Made Materially Misleading or False Statements.*

Defendant Shearer does not concede that any misleading or false statements were made.  Nevertheless, District Court erroneously applied the relevant standard

in reaching its conclusion that StratoComm made materially misleading statements. District Court stated that the press releases and the Executive Overview "falsely portrayed [StratoComm] as a development-stage company that had progressed to the operational stage with a finished product and sales, when it had not" [SPA: 22]. This assertion is belied by the very contents of those statements themselves.

"[I]n order for the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" (ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553, F.3d 187, 197 [2d Cir. 2009], quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978 [1998] [internal quotations and citation omitted]). Although District Court recited the relevant standard, it utterly ignored it.

It is unclear how District Court could have reached its conclusion that StratoComm falsely portrayed itself as having progressed beyond the development stage in the face of the Overview's express statement that "StratoComm is a development-stage company [with] no revenues and limited assets [and] no assurance that the Company will generate significant revenues in the future or that it will be able to generate sufficient cash flow to meet expenses" [A: 98]. While District Court's inference might be a possible one, it was contradicted by language found in the same document that says exactly the opposite.

The press releases issued in November 2007 and January 2008 accurately reflected agreements entered into by the company, and when read in light of the Overview, the total mix of information clearly communicated that sales revenue had yet to be received.  The May 2009 press release also conveyed accurate information that was not materially misleading because it simply and accurately reported the facts contained within the document itself.  The other statements by defendants made prior to that 2009 press release do not make its meaning less clear; if anything, they serve to make it clearer: StratoComm was demonstrating the viability of its product to a purchaser.

Thus, the "total mix" of information included statements abjectly contradicting the inference that District Court sought to draw.  Inexplicably, District Court failed to address or consider these statements—the "total mix" of available information—in reaching its erroneous conclusion that has the effect of denying defendants the due process to which they are entitled.

3. ***District Court Erred in Determining that StratoComm and Shearer Made False and Misleading Statements with Scienter.***

Scienter requires a showing of an intent to deceive, knowing misconduct or reckless disregard for the truth (see Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 11382 n. 12 [1976]; S.E.C. v First Jersey Securities, Inc., 101 F.3d 150, 1467 [2d Cir. 1996]); S.E.C. v. McNulty, 137 F.3d 732, 741 [2d Cir. 1998]).  Recklessness requires a showing of "conduct which is highly unreasonable

and which represents an extreme departure from the standards of ordinary care"
(<u>S.E.C. v. McNulty</u>, 137 F.3d at 741 [internal quotations omitted]; <u>see</u> <u>Rolf v.</u>
<u>Blyth, Eastman Dillon & Co.</u>, 570 F.2d 38, 47 [2d Cir. 1978]).

Here, the SEC alleged only that Shearer and StratoComm engaged in
knowing misconduct, and District Court adopted this assertion, disregarding
without justification the contradictory contentions raised by defendants in
opposition.  District Court again relied on its interpretation of the word "provider"
to exclude companies like StratoComm that are ready to provide and able to
provide a product, but who still are seeking a purchaser who can afford their
product, awaiting—according to District Court's logic—that alchemical moment
where, upon a single sale, a company is transformed from non-provider into
provider.

It is respectfully submitted that, as set forth above, in the same way that
District Court improperly interpreted and applied the definition of "provider," to
the extent StratoComm was described as a provider by Shearer, that statement was
neither the product of knowing misconduct nor reckless disregard for the truth.
While District Court may be correct in stating that defendants Shearer and
StratoComm have conceded that, other than the Beta testing performed in
Cameroon, the company had not supplied telecommunications infrastructure
technologies to anyone or installed a TTS at the time the press releases and

Overview were issued, Shearer has repeatedly disputed the assertion that the TTS was not "presently available," in the form of both avowals to the contrary and technical explanations of how the TTS was in fact available to any bona fide purchaser.

Mr. Shearer has patiently and repeatedly explained, including at depositions throughout this litigation, in "The Truth Should Matter, in the Overview and by affidavit, that the TTS is an amalgam of technologies, including the StratoComm proprietary payload and commercially available aerostats, which are to be assembled as a package according to a purchaser's specifications. The components necessary to assemble any ordered TTS have always been "presently available" and thus the TTS has always been "presently available."

In finding that StratoComm vis-à-vis Shearer engaged in knowing misconduct, District Court necessarily concluded that Shearer acted with a deliberate "intent to deceive, manipulate, or defraud" (Ernst & Ernst, 425 U.S. at 193 n.12, 96 S.Ct. at 1381 n.12). However, to the extent that any misleading statement was made (e.g. the reference to "installed TTSs" in the Overview), such was merely the product of negligence, which "is not a sufficiently culpable state of mind to support a section 10(b) civil violation" (S.E.C. v. Obus, 693 F.3d 276, 286 [2d Cir. 2012]).

The conclusion reached by District Court that Shearer acted to deliberately deceive required picking isolated phrases and terms from the vast corpus of press releases and a 50-page overview, and then showing those phrases in the light least favorable to defendants, while simultaneously rejecting out of hand all contradictory explanations by defendants. This flawed analysis actually demonstrates that, at worst, Shearer acted negligently. District Court had to go to the greatest of lengths of inference and supposition to make its determination that the only reasonable conclusion a factfinder could reach was that the press releases and Overview portrayed StratoComm as a company that had a finished, tested product and multi-million-dollar TTS sales. Those lengths belie the one truly legitimate conclusion: that a reasonable factfinder could conclude that the situation was far more nuanced than the one-dimensional interpretation perceived by the District Court, that StratoComm was a development stage company that had entered into certain sales contracts but had yet to receive revenue, and that the company's future success was merely a probability, and not guaranteed.

As noted above, StratoComm's statements say much more than those few things that District Court focused on, and the Promethean leap from a negligent omission to knowing misconduct is not justified on this record. For example, while District Court dismisses the contracts referred to in the November 2007 and January 2008 press releases as "at best, signing of some contracts where no money

ever exchanged [sic] hands" [SPA: 26], the fact is that many business deals occur with the "signing of some contracts" where the money is to change hands at a future date and time, often conditioned on events that may or may not occur.

District Court has reduced the business model pursued by StratoComm to the simplicity of an independent bootmaker, an equivocation that cannot be supported.  While it might be true that a bootmaker is expected to have some boots for sale in his shop, even District Court would agree that the bootmaker's  custom products are "presently available," though a purchaser would likely have to supply a down payment and wait several weeks or months for the bootmaker to craft his order.

Ultimately, and as Mr. Shearer has repeatedly stated, all statements made by StratoComm were made with the purpose of accurately communicating to investors the developments, the hopes and the realistic limitations of the company, and summary judgment is an inappropriate vehicle by which to ignore his version of events in favor of what can at best be described as the competing version put forth by the SEC.

III.    DISTRICT COURT ERRED IN CONCLUDING THAT NO TRIABLE
        ISSUES OF FACT EXISTED AS TO WHETHER DEFENDANTS
        IMPROPERLY ENGAGED IN THE OFFERING AND SALE OF
        UNREGISTERED SECURITIES, AND THEREFORE PARTIAL
        SUMMARY JUDGMENT SHOULD NOT HAVE BEEN GRANTED.

It is undisputed that the relevant shares of StratoComm that were issued by

the company and sold to investors were not registered.  However, defendants

Shearer and StratoComm assert that the sales were exempt private offerings.

District Court improperly concluded that Shearer and StratoComm raised no triable

issue of fact as to the applicability of this exemption.

First, District Court stated, because "an offering of securities . . . <u>may</u> be a

public offering though confined to stockholders of an offering company" (citing

<u>S.E.C. v. Sunbeam Gold Mines Co.</u>, 95 F.2d 699, 702 [9th Cir. 1938] [emphasis

added]), that therefore StratoComm's offerings to its shareholders were public

offerings [SPA: 36].[3]  However, the import of this fact goes directly to District

Court's second faulting of the defendants' claim to the exemption: that defendants

failed to produce evidence of the required exact number and identify of all offerees

[SPA: 36].  This is confounded by the fact that the record contains the identity of

all StratoComm shareholders, and thus consequently the identity and number of all

offerees.

---

[3] District Court never addressed why it read "may" as "must."

Next, although there were a few unaccredited investors, those investors numbered less than 35 and were provided with or given access to significant financial statements and the Overview [A: 231-233], which District Court itself equated to a prospectus [SPA: 17], and which is essentially the equivalent of an offering memorandum.

The offerees who invested in StratoComm whose investments form the basis of the complaint of sale of unregistered securities were almost all pre-existing shareholders, almost all of which were accredited investors, all of whom were related by their combined interest in and familiarity with the company. Here, "each offeree [was] afforded the same information that would have been afforded to a prospective investor in a public offering, or . . . had such information or ready access to it" (Wellman v. Dickson, 475 F. Supp. 783, 819 [S.D. N.Y. 1979]; see S.E.C. v. Murphy, 626 F.2d 633, 647 [9th Cir. 1980]). Roger Shearer made a personal effort to meet and speak with every investor, and it was his universal policy to provide as much information, including financial documentation, that any requester sought [A: 231-232].

It is respectfully submitted that, at a minimum, defendants established a triable issue of material fact as to their entitlement to the private offering exemption to the registration requirement, making the grant of summary judgment inappropriate.

## <u>CONCLUSION</u>

For the foregoing reasons, respondent respectfully requests that the decision and order of the District Court be REVERSED, and plaintiff's motion for partial summary judgment be, in all respects, DENIED and DISMISSED.

Dated: August 1, 2014

Respectfully submitted,


   /s/ James C. Knox
JAMES C. KNOX, ESQ.
E. STEWART JONES, PLLC
*Attorney for Defendant-Appellant*
*Roger D. Shearer*
Office and P.O. Address
28 Second Street
Troy, New York 12180
Tel: (518) 274-5820
Fax: (518) 274-0556
Email: knox@esjlaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times Roman proportional font and contains 7,918 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: August 1, 2014

<u>/s/ James C. Knox</u>
James C. Knox
*Counsel for Defendant-Appellant*